UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOE HAND PROMOTIONS, INC.,

    Plaintiff,

v.

    Case No. 10-15102

PHOENIX PROMOTIONS LLC, a Michigan
Limited Liability Company, d/b/a BLACKBERRY
BAR & GRILL, SALLY B. STALLWORTH,
individually, jointly and severally,

    Hon. John Corbett O'Meara

    Defendants.

and

PHOENIX PROMOTIONS LLC, a Michigan
Limited Liability Company, d/b/a BLACKBERRY
BAR & GRILL, SALLY B. STALLWORTH,
individually, jointly and severally,

    Third-Party Plaintiffs,

v.

COMCAST OF MICHIGAN, LLC,

    Third-Party Defendant.
_____/

## OPINION AND ORDER REGARDING
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

    Before the court are cross-motions for summary judgment, filed May 4, 2012, which have been fully briefed. The court heard oral argument on July 12, 2012, and took the matter under advisement. For the reasons set forth below, the court grants both motions in part and denies them in part.

## BACKGROUND FACTS

This a cable "piracy" case. Plaintiff Joe Hand Promotions, Inc., is a distributor of televised sporting events. Defendant Sally B. Stallworth owns Defendant Phoenix Promotions LLC d/b/a Blackberry Bar & Grill. Plaintiff contends that Defendants violated the Federal Cable Communications Policy Act, 47 U.S.C. § 553, by broadcasting a boxing event titled "Ultimate Fighting Championship 92: The Ultimate 2008" (the "Program"), which was broadcast on December 27, 2008.[1] Plaintiff owns the right to broadcast the Program, which residential customers can typically order as a "pay-per-view" program from their cable provider. Commercial establishments such as bars and restaurants are required to pay a commercial license fee in order to publicly broadcast such programs.

Defendants ordered the Program by phone from their cable provider, Comcast. Comcast provided the Program as ordered and charged Defendants the residential fee of $44.99. It is undisputed that Defendants maintained a commercial cable account through Comcast and that the Blackberry Bar & Grill did not attempt to represent itself to be a residential customer. Based upon the capacity of the Blackberry Bar & Grill (about 30 customers the day of the Program), the commercial rate set by Plaintiff was $750.

Defendants signed a service order to obtain cable from Comcast on October 16, 2007. That agreement provides that it consists of the service order and the "standard Comcast Business Class Terms and Conditions." The Comcast terms and conditions are not set forth in the service

---

[1] Plaintiff's complaint also contains claims for conversion and violations of 47 U.S.C § 605, which Plaintiff has agreed to withdraw without prejudice. In light of Plaintiff's failure to defend these claims on Defendants' motion for summary judgment, however, the court will dismiss them with prejudice.

order signed by Stallworth, but the service order indicates that they may be found at http://business.comcast.com/terms-conditions/index.aspx. Comcast's website contains a link to the terms in conditions in effect on October 16, 2007. The terms and conditions provide: "Customer hereby acknowledges and agrees that Comcast does not have the right to distribute pay-per-view video programming (including programming such as sporting events) and certain premium video services to commercial establishments. Therefore, Customer agrees that it shall not exhibit or assist in the exhibition of any such programming unless explicitly authorized to do so, in advance and in writing, by Comcast and the applicable program or event distributor." Terms and Conditions at ¶ 21.1 (revised August 2007), Pl.'s Ex. F.

Based upon this language, Plaintiff contends that Defendants knew that they were not authorized to obtain and exhibit the Program. Defendants disclaim any knowledge of the Comcast terms and conditions. Plaintiff contends that Defendants' showing of the Program without paying the commercial license fee violates 47 U.S.C. § 553, which provides:

> No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, *unless specifically authorized to do so by a cable operator* or as may otherwise be specifically authorized by law.

Id. (emphasis added). Plaintiff's argument is that Comcast did not have the authority to allow Defendants to obtain the Program at the residential rate instead of the commercial rate. Defendants contend, however, that it ordered the Program from Comcast without realizing that they were required to pay anything more than the fee charged by Comcast. Defendants assert that they did not violate the statute because they received the Program with Comcast's authorization.

# LAW AND ANALYSIS

## I. Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When reviewing a motion for summary judgment, the facts and any reasonable inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## II. Liability under 47 U.S.C. § 553

Both sides seek summary judgment. In support of their motion, Defendants rely primarily on J & J Productions, Inc. v. Schmalz, 745 F. Supp.2d 844 (S.D. Ohio 2010), in which the court found that a bar owner did not violate 47 U.S.C. § 553 when it ordered and paid for a program that the cable operator was not authorized to broadcast. The court explained:

> Under the plain language of the statute, "[n]o person shall . . . receive . . . any communications service offered over a cable system, *unless specifically authorized to do so by a cable operator*. . . ." Nowhere in this language is the term "cable operator" qualified with language indicating that the cable operator must be an "authorized" cable operator. We believe this to be a relevant distinction. Give the stated purpose of the Cable Communications Policy Act, to combat the increasingly occurring theft of cable service, we do not find that Defendants' conduct is the type of conduct which Congress intended to reach.

Schmalz, 745 F. Supp.2d at 851 (emphasis in original). The court further noted that the defendant was a commercial cable customer and at "no time did Defendants misrepresent their status as a commercial customer." Id.

It was entirely reasonable for Defendants, wishing to broadcast the

> fight in their establishment, to inquire as to the availability and
> pricing for such from its cable provider. That TWC was not
> authorized to sell such rights to Defendants was not a fact of which
> Defendants were aware or should reasonably be expected to be
> aware. It was TWC's responsibility under the terms of its
> licensing agreement to make Defendants aware that it was not
> authorized to sell such rights to Defendants and, if possible, direct
> Defendants to the entity which did possess those rights. For these
> reasons, as well as those stated above, we find that Defendants'
> conduct did not violate 47 U.S.C. § 553.

Id.

At least two other courts have found liability under § 553, however, under circumstances virtually identical to those here. In J and J Sports Productions, Inc. v. Coyne, __ F. Supp.2d __, 2012 WL 761688 (N.D. Cal. Mar. 7, 2012), the defendant ordered a pay-per-view program from its commercial Comcast account and Comcast charged it the residential rate. The defendant relied on Schmalz to argue that it had not violated § 553 because Comcast had authorized it to receive the program. The Coyne court disagreed, finding that the Comcast terms and conditions required the defendant to obtain authorization in writing from Comcast and the program distributor before exhibiting the program. The court reasoned that, because the defendant did not obtain such authorization, it was not "specifically authorized" to receive the program under § 553. See also J & J Sports Productions, Inc. v. TCOS Enter., Inc., 2012 WL 124482 (E.D. Pa. Jan. 13, 2012) (bar that ordered program through Comcast commercial account was not "specifically authorized" under § 553 because Comcast's terms and conditions required the bar to obtain authorization in writing).

On balance, the court finds the analysis set forth in Coyne and TCOS more persuasive than that in Schmalz. The Comcast terms and conditions require that Defendants obtain authorization in writing before exhibiting the Program. This is in contrast to the facts of

Schmalz, where it was the cable operator's contractual responsibility to inform the defendant that it was not authorized to provide it with certain programming. Here, based upon Comcast's terms and conditions, Defendants "knew or reasonably should have been aware that Comcast was not in a position to authorize it to transmit the Program." Coyne, 2012 WL 761688 at *5. The service order informed Defendants that the parties' agreement included the terms and conditions, and directed Defendants to Comcast's website. That Defendants chose not to read the terms and conditions is of no moment. See id. (imposing liability despite the fact that the defendant did not read Comcast's terms and conditions). The court finds that Defendants were not "authorized" to exhibit the Program pursuant to 47 U.S.C. § 553.

### III.   Damages

Plaintiff seeks statutory and enhanced damages under 47 U.S.C. § 553(c). A prevailing plaintiff may recover "an award of statutory damages for all violations involved in the action, in a sum of not less than $250 or more than $10,000 as the court considers just." 47 U.S.C. § 553(c)(3)(A)(ii). Although courts have not adopted a uniform approach, statutory damages awarded by the court "should take into account the proportionality between the loss suffered by the plaintiff and the profit gained by the defendant." J & J Sports Productions, Inc. v. Ribeiro, 562 F. Supp.2d 498, 501 (S.D.N.Y. 2008). As the Coyne court explained:

> District courts have thus considered different factors to determine culpability and to achieve proper compensation and deterrence. These include: use of cover charge, increase in food price during programming, presence of advertisement, number of patrons, number of televisions used, and impact of offender's conduct on the claimant. Repeated violations may also justify enhanced damages.

Coyne, 2012 WL 761688 at *6. The Ribeiro, court noted this approach:

> When the exact number of patrons is unknown, courts will award a flat sum based on consideration of justice. When the exact number of patrons is known, the court will base the award on the number of patrons in the establishment who viewed the unauthorized showing multiplied by a number set by the court. This number varies widely from $20 to $300, although most courts set a number around $50.

Ribeiro, 562 F. Supp.2d at 501-502.

Plaintiff seeks $10,000 in statutory damages, the maximum amount permitted. The facts of this case, however, do not support such an award. Defendants exhibited the Program on two of the four televisions in the establishment; at the time, there were between twenty-four and thirty-two patrons in the bar. See Pl.'s Ex. C. The commercial rate to Defendants to exhibit the Program would have been $750. Pl.'s Ex. B-1. Defendants did not advertise the Program, charge a cover, or increase food prices during the Program. The evidence in this case does not support an inference that Defendants' violation was willful, but that Defendants were unaware of their obligation to obtain authorization before exhibiting the Program.

In light of the facts and circumstances of this case, the court finds $750 to be an appropriate statutory damages award, sufficient to compensate Plaintiff for lost revenue while deterring future violations. See Coyne, 2012 WL 761688 at *6 (awarding minimum statutory damages of $250 and conversion damages in the amount of the commercial broadcast rate). Because Plaintiff has not demonstrated that the violation was willful, the court declines to award enhancement damages under § 553(c)(3)(B). See id.

**IV.     Attorney's Fees**

Under 47 U.S.C. § 553(c)(2)(C), the court may award costs and reasonable attorney fees to the prevailing party. The court finds that such an award is appropriate here. Plaintiff seeks

$6,072.50 in attorney's fees and costs, comprised of 32.10 attorney hours at a rate of $175 per hour, one paralegal hour at a rate of $75 per hour, the $350 filing fee, and $30 in process server fees. See Pl.'s Ex. G. Upon review, the court finds both the hours expended on this matter and the hourly rates to be reasonable. See Pl.'s Ex. H (State Bar of Michigan, <u>2010 Economics of Law Practice Attorney Income and Billing Rate Summary Report</u>). Therefore, the court will award Plaintiff $6,072.50 in attorney's fees and costs.

## ORDER

IT IS HEREBY ORDERED that Plaintiff's motion for summary judgment is GRANTED IN PART and DENIED IN PART, consistent with this opinion and order. Plaintiff shall submit a proposed judgment in the amount of $6,822.50.

IT IS FURTHER ORDERED that Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART, consistent with this opinion and order.


                                                       s/John Corbett O'Meara
                                                       United States District Judge

Date:  July 24, 2012


I hereby certify that a copy of the foregoing document was served upon counsel of record on this date, July 24, 2012, using the ECF system.


                                                        s/William Barkholz
                                                     Case Manager